DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

UNITED STATES OF AMERICA and )
PEOPLE OF THE VIRGIN ISLANDS, )
                               )
                               )
           v.                  )        Criminal No. 2014-0051
                               )
                               )
KETISHA ISLES,                 )
                               )
                Defendant.     )
_____)

Attorneys:
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
         *For the United States and the Virgin Islands*

**Jomo Meade, Esq.,**
St. Croix, U.S.V.I.
         *For the Defendant Ketisha Isles*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Ketisha Isles' Motion to Suppress (Dkt. No. 9), and the Government's Opposition thereto (Dkt. No. 11). For the reasons that follow, the Court will deny Defendant's Motion.

## I.    BACKGROUND AND EVIDENCE

On July 29, 2014, the Government filed a five-count Indictment charging Defendant Isles with violations of federal and local law in relation to the armed robbery on June 17, 2013 of Perfection Gift Shop ("Perfection"), located in the Sunny Isles shopping center on St. Croix, U.S. Virgin Islands. (Dkt. No. 1).[1] In her Motion to Suppress, Defendant seeks to suppress all

---

[1] The Indictment charged Isles with Conspiracy to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951; Interference with Commerce by Robbery, in violation of 18

statements she allegedly made while she was questioned by law enforcement officers on June 21, 2013, on the grounds that she was unlawfully arrested without probable cause. (Dkt. No. 57 at 3–4). Further, Defendant seeks to suppress a "second set of statements" she made that day on the grounds that her *Miranda* rights were violated pursuant to *Missouri v. Seibert*, 542 U.S. 600 (2004). (*Id.* at 4–5).

At the evidentiary hearing, the parties presented testimony and arguments on Defendant's Motion to Suppress. Detectives Leon Cruz and Kurt Fieulleteau of the Virgin Islands Police Department testified for the Government. The Defendant's mother, Beverly Joseph, testified for the defense. The following facts emerged from the testimony at the suppression hearing.[2]

## A.    The Government's Version of the Events Preceding the Questioning of Isles

The Government's version of the events preceding the questioning of Defendant Isles at the police station—based on the testimony of Detective Cruz—can be summarized as follows.

During his investigation of the June 17, 2013 armed robbery at Perfection, Detective Cruz reviewed the store's surveillance footage. The footage showed Defendant Isles entering Perfection with a cellphone to her ear, walking to the back of the store, looking around, and then leaving the store. The footage further showed Defendant Isles outside of Perfection walking towards the AT&T store, where she was approached by "an Arab guy."

---

U.S.C. § 1951; Conspiracy to Use and Carry a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(o); Using and Carrying a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c); and Robbery First Degree, in violation of 14 V.I.C. § 1862(2). The Government had previously filed an Information against Isles on March 6, 2014 (1:14-cr-0009), which was dismissed in October 2014 following the filing of the Indictment. Defendant Isles re-filed her suppression motion in the new case.

[2] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

Defendant Isles can then be seen in the video in front of Perfection, pacing back and forth. She looked to her left, in the direction of the AT&T store, and opened the door to Perfection. She held the door open while four individuals, with their faces covered and armed with guns, entered. The store's employees and patrons ran to the back of the store and Defendant Isles "went to the floor," where she remained for the duration of the robbery. The four assailants took jewelry from the store and then left. Defendant Isles left Perfection after the assailants left.

Through his investigation, Detective Cruz learned that an individual named Ajani Plante, also known as "Jahno," might have been involved in the robbery. On June 21, 2013, Detective Cruz visited the scene of the robbery. While there, he observed Plante walk in front of Perfection, stop, look at the store, and "fix his hat." Plante then walked away and got into the front passenger seat of a green four-door Ford Taurus. Defendant Isles was seated in the back of the car and another individual was in the driver's seat. The Taurus left the Sunny Isles shopping area and Detective Cruz lost sight of it. He advised several police officers to be on the lookout for the vehicle.

Later that day, Detective Cruz was parked by Wendy's at Sunny Isles shopping center and observed Defendant Isles leave the Rainbow store, get into the driver's seat of the same Ford Taurus, and drive away. No one else was in the car. Cruz advised officers in the area that, if they saw the car, to "traffic stop" it. A few minutes later, two officers "traffic stopped" the Ford Taurus.

Detective Cruz immediately drove to the site of the traffic stop, introduced himself to Defendant Isles, and asked her if she could drive to the police station in Frederiksted because he needed to ask her some questions. Defendant Isles said okay, and drove to the police station. No

police officers escorted Defendant Isles to the police station. According to Detective Cruz, Defendant Isles had the option to meet him at the police station or not.

**B.      The Defense's Version of the Events Preceding the Questioning of Isles**

Ms. Joseph testified that Defendant Isles called her after being stopped by the police. Defendant Isles informed Ms. Joseph that the police had stopped her and told her that she had to go to the police station. Defendant Isles sounded scared and nervous, and requested that Ms. Joseph meet her at the police station. Ms. Joseph said she would do so.

**C.      The Government's Version of the Events Surrounding the Interviews**

**1.      Detective Cruz's Testimony**

After Defendant Isles arrived at the police station, Detective Cruz escorted her into his office. Prior to Defendant Isles' arrival, Cruz had set up a video camera, but it was not running when she entered the room. Detective Cruz told Defendant Isles that she was not under arrest. She was not placed in handcuffs. The door to the office was closed but unlocked. The only other person in the office was Detective Vanessa Richardson.

Detective Cruz told Defendant Isles that he had reviewed the surveillance footage from Perfection, which showed her in the store during the robbery. Cruz asked Isles about the robbery and about what she observed and experienced. Defendant Isles told Detective Cruz that she was in Perfection looking at some jewelry; that she left to go to the bank to get money; and that, as she re-entered, four individuals came in and robbed the store.

After Defendant Isles made these statements—approximately ten to fifteen minutes after Defendant Isles had entered the room—Detective Fieulleteau arrived. Detective Cruz and Fieulleteau stepped outside the office. Detective Fieulleteau told Cruz that Defendant Isles' mother was in the lobby. Detective Cruz told Detective Fieulleteau to bring Ms. Joseph back to

the office. Detective Cruz stated that he "probably" initially told someone that Ms. Joseph could not come back to his office because Defendant Isles was an adult.

When Detective Fieulleteau brought Ms. Joseph back to the office, Detective Cruz explained the situation to her. Ms. Joseph encouraged Defendant Isles to tell the Detectives "the truth." Defendant Isles then said she would tell the truth. Detective Cruz described the atmosphere as "calm," "nice, no pressure." Detective Fieulleteau escorted Ms. Joseph out of the office, and Defendant Isles sat in front of the camera. Detective Cruz gave Defendant Isles a *Miranda* waiver form, which he read to her. She signed the form, as did Detectives Cruz and Richardson. The video interview then began.

In her video-recorded statement, Defendant Isles stated that she knew about the plan for the robbery about a week in advance. When she was outside of Perfection, an "Arab guy" approached her and whispered, "it's about to go down." She then opened the door for the four assailants to enter Perfection. Plante had previously instructed her to pick up anything that fell during the robbery, and she picked up a cell phone that had fallen.

After Defendant Isles made her video statement, Ms. Joseph was brought back into the office. Defendant Isles' phone rang and Detective Fieulleteau told her to answer it. Everyone then heard Plante making threats directed at Defendant Isles and her family. After the call, Defendant Isles left the station with Ms. Joseph.

Detective Cruz did not testify with certainty as to how long Defendant Isles' questioning lasted. He first stated that he did not know, but nevertheless estimated that he spoke with her for more than twenty or thirty minutes. On cross-examination, he asserted that the initial questioning could have been more than twenty or thirty minutes, or could have been forty-five minutes or an

hour. He then estimated that the initial questioning and the video statement together took approximately forty-five minutes, "more or less."

    **2.**    **Detective Fieulleteau's Testimony**

When Detective Fieulleteau arrived in Detective Cruz's office, Detectives Cruz and Richardson were present with Defendant Isles, but were not asking her questions. The camera was not running and Detective Fieulleteau did not believe that there was "any interview going on." Detective Fieulleteau immediately recognized Defendant Isles' face and told Isles, "I recognize your face," before stating to Cruz and Isles, "that's the young lady from the video this morning."

Detective Cruz informed Fieulleteau that Fieulleteau knew Defendant Isles' mother and that she was in the lobby of the police station. Detective Fieulleteau went to the lobby and recognized Ms. Joseph, who was there with Isles' stepfather. Ms. Joseph told Fieulleteau that her daughter was in the police station and that she was trying to find out what was going on. Detective Fieulleteau then returned to Detective Cruz's office and told Cruz that he needed to tell Ms. Joseph what was going on. Detective Fieulleteau returned to the lobby, briefly explained what was happening to Ms. Joseph, and brought her back to the office.

In the office, Detective Cruz briefed Ms. Joseph. Ms. Joseph spoke with Defendant Isles and told her to tell the truth. Fieulleteau then took Ms. Joseph back to the lobby. There, Ms. Joseph told Isles' stepfather what was happening, and the stepfather asked to come back and speak with Defendant Isles. Detective Fieulleteau took Ms. Joseph and Isles' stepfather back to the office, introduced them to Detective Cruz, and the stepfather asked some questions and spoke with Defendant Isles. Detective Fieulleteau then took Ms. Joseph and Isles' stepfather back to the lobby and left Defendant Isles in the office with Detectives Cruz and Richardson.

Detective Fieulleteau then returned to the office, spoke with Defendant Isles, and told her to talk and "say what's going on," because "we saw the video and everything and she can just talk." Defendant Isles' phone rang and she was afraid to answer because it was Plante. Detective Fieulleteau told her to answer on the speaker phone and talk normally, but not to give any indication that she was at the police station. Plante made several threats.

**D.      The Defense's Version of the Events Surrounding the Interviews**

Ms. Joseph testified that she arrived at the police station around 3:45 p.m. She asked a female officer at the front window if she could see Defendant Isles. The officer went "in the back," returned, and told Ms. Joseph that Defendant Isles was in the back with the officers, but that Ms. Joseph could not see her because Defendant Isles was not a minor.

Ms. Joseph did not see Defendant Isles until "evening time"—after 6:00 or 7:00 p.m.—when Detectives Cruz and Fieulleteau walked into the lobby with Defendant Isles between them. Detective Cruz asked Defendant Isles if Ms. Joseph was her mother, and Defendant Isles said yes.

Ms. Joseph asked what happened, and Detective Cruz stated that he would let Defendant Isles tell her. Ms. Joseph was with Defendant Isles' stepfather, and the three of them exited the building and went into the parking lot. Just as Defendant Isles was about to tell Ms. Joseph what happened, Detective Fieulleteau called to Ms. Joseph and asked her to come inside so he could explain the situation to her. Ms. Joseph left Defendant Isles in the parking lot with her stepfather and followed Detective Fieulleteau to the interview room. At that point, the detectives explained to Ms. Joseph that her daughter came to the station to be asked some questions about a robbery in Sunny Isles.

Defendant Isles came back into the interview room, and Ms. Joseph told her, "I hope you're telling the truth, tell them everything." After the conversation with the officers, Ms. Joseph stated that she turned to Defendant Isles who told her what happened.

Ms. Joseph testified that these events in the interview room took place after Defendant Isles' interview had been conducted, and that they left afterwards without Defendant Isles being interviewed again. In response to a question asking whether she was "escorted out of the office" after she told her daughter that she hoped that her daughter was telling the truth, Ms. Joseph stated that she left the building to move her car from the police station parking lot to Defendant Isles' stepfather's house. Ms. Joseph drove the car to the house, exchanged cars, and returned to the police station. In her estimation, that trip allegedly took no more than five minutes. She stated she did not know what happened at the police station during that time.

Ms. Joseph further testified that Defendant Isles is twenty-one years old and graduated high school on June 10, 2014. According to Ms. Joseph, Defendant Isles is dyslexic and processes things slower than "regular children." As a result, Defendant Isles was in smaller classes in school.

## II. DISCUSSION

### A. Traffic Stop

Defendant Isles contends that the events leading up to her interrogation—*i.e.*, the traffic stop and transportation to the police station—constituted an unlawful seizure and an illegal arrest without probable cause, and that all her subsequent statements should be suppressed because there were no intervening circumstances to dissipate the "taint" of her unlawful arrest. (Dkt. No. 57 at 3–4).

The Supreme Court has held that the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809-10 (1996). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id*. at 810. If a seizure occurs, a court has to determine whether the seizure was based on reasonable suspicion, which demands that the detaining officers "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417-18 (1981); *see also United States v. Whitted,* 541 F.3d 480, 489 (3d Cir. 2008). The police officers must demonstrate that the stop was based on something more than an '"inchoate and unparticularized suspicion or hunch.'" *United States v. Sokolow,* 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 27 (1968)).

Here, Detective Cruz, who was in a parked car, saw Defendant Isles drive off in the same Ford Taurus in which he had earlier seen Defendant Isles in the company of Plante. He told other officers in the area to "traffic stop" the car if they saw it. A few minutes later, after having heard the car was stopped, he "immediately" went to the location, and introduced himself to the driver, Defendant Isles. Detective Cruz asked her if she could travel to the Frederiksted police station because he needed to ask her some questions. According to Detective Cruz, the conversation did not last more than five minutes. He then drove off.

The Third Circuit, in *United States v. Brown*, 448 F.3d 239 (3d Cir. 2006), observed that '"a finding of reasonable suspicion to justify the stop require[s] the presentation of evidence by the government that the officer who issued the radio bulletin [Cruz] had reasonable suspicion, not simply that it was reasonable for the arresting officer . . . to have relied on the bulletin.'" *Id.*

9

at 248 (quoting *United States v. Coward*, 296 F.3d 176, 180 (3d Cir. 2002)); *see also Rogers v. Powell,* 120 F.3d 446, 453 (3d Cir. 1997) ("The legality of a seizure based solely on statements issued by fellow officers depends on whether the officers who *issued* the statements possessed the requisite basis to seize the suspect.") (emphasis in original).

Detective Cruz had reasonable suspicion to believe that Defendant Isles participated in the robbery. He had observed Defendant Isles in the surveillance footage enter Perfection shortly before the robbery; leave the store and interact with a man; re-enter the store and hold the door open for the robbers; and leave after the robbers exited. Further, Cruz observed Plante, who Detective Cruz believed to be a participant in the robbery, get into a car with Defendant Isles near Perfection a few days later. Accordingly, the Court finds that Detective Cruz had the requisite reasonable suspicion to justify the stop. Thus, the actions of the officers in effecting the stop in reliance on Detective Cruz's communication were proper.

In sum, considering the totality of the circumstances, the traffic stop did not violate the Fourth Amendment. Nor did the stop constitute an arrest—let alone an illegal arrest—without probable cause. As discussed below, when asked to do so, Defendant Isles went on her own to the police station for questioning. Thus, her trip to the police station did not constitute an arrest. Accordingly, the Court rejects Defendant Isles' argument that her statements should be suppressed because they were the fruit of an illegal seizure or an unlawful arrest.

## B. Custody Determination

### 1. General Legal Principles

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

> While "admissions of guilt by wrongdoers, if not coerced, are inherently desirable," *United States v. Washington*, 431 U.S. 181, 187, 97 S. Ct. 1814, 52 L.

> Ed. 2d 238 (1977), the Supreme Court in *Miranda* [*v. Arizona*, 384 U.S. 436, 479 (1966)] "presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights." *New York v. Quarles*, 467 U.S. 649, 654, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984). The "*Miranda* rights," while not constitutionally compelled, have a "constitutional underpinning," and thus, they may not be rescinded by an act of Congress or be treated with anything but the most scrupulous regard by a reviewing court. *Dickerson v. United States*, 530 U.S. 428, 440 n.5, 444, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000).

*United States v. Drummond*, 482 F. App'x 686, 690 (3d Cir. 2012). Accordingly, "[c]ourts must exclude testimonial evidence obtained while a suspect is (1) in custody and (2) subject to interrogation, if the police failed to provide *Miranda* warnings, which ensures that the statement was not obtained in violation of the suspect's Fifth Amendment right against compelled self-incrimination." *United States v. Frisby*, 474 F. App'x 865, 867 (3d Cir. 2012) (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 590 (1990)).

"Custody," for purposes of a *Miranda* analysis, concerns "the objective circumstances of the interrogation, . . . asking how a reasonable person in the suspect's position would understand [her] freedom . . . to leave, [thereby avoiding] burdening police with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person's subjective state of mind." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011). "Interrogation," for purposes of a *Miranda* analysis, is "express questioning as well as its functional equivalent, *i.e.*, 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Martinez*, 460 F. App'x 190, 193 (3d Cir. 2012) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The Government bears the burden of proving by a preponderance of the evidence that a challenged statement is voluntary. *United States v. Jacobs*, 431 F.3d 99, 108-09 (3d Cir. 2005) (citing *Lego v. Twomey,* 404 U.S. 477, 489 (1972)).

The first question the Court must address is whether Defendant Isles was in custody for *Miranda* purposes because, in order to invoke *Miranda's* exclusionary rule, the statement must have been obtained during a custodial interrogation. *Innis*, 446 U.S. at 299–300; *United States v. Mesa*, 638 F.2d 582, 584 (3d Cir. 1980) ("*Miranda* warnings are designed to protect against the evils of 'custodial interrogation,' and they are not intended to unduly interfere with a proper system of law enforcement or to hamper the police's traditional investigatory functions."). The Government contends that Defendant Isles was not in custody for *Miranda* purposes. (Dkt. No. 65 at 5–6).

The Third Circuit has noted:

> [T]here are at least three differently worded tests for when a person is in custody: (1) when the person has been deprived of her or his freedom in some significant way; (2) when a reasonable person would perceive that she or he was not at liberty to terminate the interrogation and leave; and (3) when there is a restraint on the person's freedom of movement of the degree associated with a formal arrest.

*Jacobs*, 431 F.3d at 105. In order for a person who has not been arrested to be in custody for *Miranda* purposes, "'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'" *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) (quoting *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974)). The custody determination is "an objective inquiry (that is, what a reasonable person would believe) based on the circumstances of the interrogation." *Jacobs*, 431 F.3d at 105 (citing *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999)). Custody determinations for *Miranda* purposes are "made on a case-by-case basis" by considering "the totality of the circumstances." *United States v. Killingsworth*, 118 F. App'x 649, 650 (3d Cir. 2004) (citing *Stansbury v. California*, 511 U.S. 318, 325 (1994)).

12

Courts may consider a multitude of factors in making a custody determination, such as: (1) the location of the questioning; (2) what the officers knew concerning the suspect's culpability; (3) whether the officers revealed their belief that the suspect was guilty; (4) whether the officers told the suspect that she or he was under arrest or free to leave; (5) the length of the interrogation; (6) whether the officers employed coercive tactics like hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (7) whether the suspect voluntarily submitted to questioning. *Willaman*, 437 F.3d at 359–60; *Jacobs*, 431 F.3d at 105.

### 2. The Totality of the Circumstances

Here, based on a totality of the circumstances, the Court finds that a reasonable person in Defendant Isles' position would perceive that she was free to terminate the interrogation and leave and thus, that Defendant Isles was not in custody.

First, the Court finds that Defendant Isles voluntarily proceeded to the police station for questioning. Based on the evidence presented at the suppression hearing, Detective Cruz—whose testimony the Court credits on this issue—arrived shortly after Isles was "traffic stopped" by police officers, introduced himself, and asked Isles if she would drive to the police station in Frederiksted because he needed to ask her some questions. Defendant Isles said okay, and drove there on her own. Detective Cruz did not transport, lead, or follow her to the station. He testified that after asking her to come to the police station, he "just drove off." He was already in the office and had set up the video camera before she arrived. According to Detective Cruz, Defendant Isles had the option to meet him at the police station or not. Although Ms. Joseph, Defendant's mother, testified that Defendant Isles telephoned her, informed her that she had been pulled over by the police and that she had to go to the police station, asked her mother to meet her there, and sounded scared and nervous, the undisputed evidence is that Defendant Isles

traveled to the police station on her own.[3] *See Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (noting that the fact that "[t]he police did not transport [the defendant] to the station or require him to appear at a particular time" was a fact that weighed against a finding that the defendant was in custody); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Accordingly, this factor weighs against a finding that Defendant Isles was in custody.

Second, the Third Circuit has instructed that "'all 'station-house' interrogations should be scrutinized with extreme care for any taint of psychological compulsion or intimidation because such pressure is most apt to exist while a defendant is interviewed at a police station.'" *Jacobs*, 431 F.3d at 105 (quoting *Steigler*, 496 F.2d at 799). However, the fact that someone is questioned at a police station does not, without more, compel a finding that a person is in custody. *See Mathiason*, 429 U.S. at 495 (noting that *Miranda* warnings are not required "simply because the questioning takes place in the station house[.]").

Here, Defendant Isles was questioned in the police station—in a room with the door closed but not locked. Two detectives—Cruz and Richardson—were present in the room with Defendant Isles, and Detective Fieulleteau came in and out of the room. Notwithstanding these facts, the salient point, in the Court's view, is the extent to which interaction was allowed to

---

[3] Other than a passing reference by Ms. Joseph to Defendant Isles' dyslexia and slower mental processes, Defendant Isles provided no evidence of her alleged mental impairments and no argument that these alleged impairments should affect the voluntariness analysis. "Although a defendant's mental condition may serve as a 'significant factor in the 'voluntariness' calculus,' the defendant's mental condition, 'by itself and apart from its relation to official coercion, should [never] dispose of the inquiry into constitutional 'voluntariness.'" *Sweet v. Tennis*, 386 F. App'x 342, 346-47 (3d Cir. 2010) (quoting *Colorado v. Connelly,* 479 U.S. 157, 164, 165 (1986)). The Court has found no cases that have considered dyslexia as affecting the voluntariness analysis, and Ms. Joseph's reference to her daughter not processing information at the same rate as her peers is extremely vague and thus unhelpful.

occur between Defendant Isles and her mother and stepfather.[4] Although the testimony was somewhat disjointed,[5] taken in its totality, such interaction occurred inside the interview room and, according to Ms. Joseph's testimony, even in the parking lot outside the building. The extent of interaction between Defendant Isles and her parents weighs against a finding that Defendant Isles was in custody. *See Killingsworth*, 118 F. App'x at 652 (ability to leave interview room to make telephone call, and other factors, weighed against a finding that defendant was in custody).

Ms. Joseph asserted that when she talked with Defendant Isles in Detective Cruz's office about what happened, it was *after* the interview had taken place—thus suggesting that her interactions with her daughter should not bear on the issue of whether Defendant Isles was in

[4] Ms. Joseph testified that she was initially rebuffed when she tried to talk with her daughter in the office where she was being questioned. Detective Cruz admitted on cross-examination that he "probably" said that Ms. Joseph could not come back to the office because Defendant Isles was an adult. However, there was no evidence that Defendant Isles was aware that her mother was prevented from coming back to the office. Detective Cruz testified that he stepped outside of the interview room to talk to Detective Fieulleteau when they were discussing the presence of Detective Isles' mother at the station. *See Yarborough,* 541 U.S. at 665 ("fact that [parents were rebuffed]—*if known to [the defendant]*—might reasonably have led someone in [the defendant's] position to feel more restricted than otherwise," and would weigh in favor of finding custody) (emphasis added). Thus, that Ms. Joseph was not allowed access to her daughter is a neutral factor in the custody analysis.

[5] According to Detective Cruz, Ms. Joseph came into the office; spoke with Defendant Isles; told her to tell the truth; left the office; and then returned to the office after Detective Cruz had recorded the video statement. Detective Fieulleteau testified that he brought Ms. Joseph into the office; she spoke with Defendant Isles; he escorted her back to the lobby; Ms. Joseph had a conversation with Isles' stepfather; and Fieulleteau brought them back to the office where they spoke with Defendant Isles. Ms. Joseph testified that her daughter—in the company of Detectives Cruz and Fieulleteau—came into the lobby of the police station; that Cruz said he would let Isles tell her mother what was going on; Ms. Joseph, Isles' stepfather, and Isles left the building and went into the parking lot; Fieulleteau called Ms. Joseph back to the building and she left Defendant Isles in the parking lot with her stepfather; Ms. Joseph went to the interview room where the detectives explained why her daughter was at the police station; Isles returned to the room and Ms. Joseph told her to tell the officers everything, to tell them the truth; Defendant Isles told her what happened; and Ms. Joseph left the building to move her car, then returned to the police station and left with her daughter.

custody during the course of the interview. However, Ms. Joseph also testified that she told Defendant Isles, "I hope you're telling them the truth, tell them everything" and "I hope you tell them the truth"—admonitions suggesting that the interview with the police was ongoing. Further, on cross-examination, Ms. Joseph acknowledged that once she Isles' stepfather were in the room with Defendant Isles, the stepfather expressed concern that Plante might see their car in the police station parking lot. As a result, Ms. Joseph left the building, drove the car to Isles' stepfather's house in Estate Whim, and returned in another car—a trip which she estimated allegedly took five minutes. She admitted that she did not know what transpired in the interview room during the time when she left to move the car.

The Court does not credit Ms. Joseph's testimony that her interaction with Defendant Isles in the interview room occurred after the interview had taken place, given her forward-looking statements urging her daughter to tell the truth, and given the fact that she admittedly did not know what happened in the interview room when she went to move the car. Detective Cruz, whose testimony the Court credits on this issue, testified that Defendant Isles' statement was video recorded after Ms. Joseph came into the room, told Defendant Isles to tell the truth, and left the room. *See United States v. Davis,* 2014 WL 1394304, at *3 (W.D. Pa. Apr. 9, 2014) ("At a suppression hearing, as the finder of fact, the Court determines the credibility of witnesses and may accept or reject any or all of a witness's testimony"). Thus, Ms. Joseph's testimony regarding the timing of her interaction with Defendant Isles as it relates to the conduct of the interview does not alter the Court's conclusion that the extent of her interactions with her daughter weighs against a finding that Defendant Isles was in custody.

Third, Detectives Cruz's and Fieulleteau's uncontroverted testimony is that the atmosphere in the office where the questioning took place was "calm," "nice, no pressure." No

threats or promises were made to Defendant Isles; the Detectives did not display any weapons; and Defendant Isles was not physically restrained. *United States v. Morgan*, 562 F. App'x 123, 130 (3d Cir. 2014) (police officers not using hostile voices, not displaying weapons, and not handcuffing the defendant or restraining his movement, along with other factors, was deemed not to constitute custody); *Killingsworth,* 118 F. App'x at 652 (that agents did not use "coercive tactics such as a harsh tone of voice, display of weapons or physical restraint," and permitted defendant to leave the room to make a telephone call weighed against a finding that defendant was in custody). In addition, Detective Cruz told Isles that she was not under arrest. *See Mathiason*, 429 U.S. at 495 (a factor indicating the defendant was not in custody was that he was specifically told he was not under arrest); *United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010) (same); *Killingsworth*, 118 F. App'x at 651 (same). Accordingly, these factors weigh against a finding of custody.

Fourth, Detective Cruz and Ms. Joseph provided conflicting testimony concerning how long Defendant Isles was at the police station. Detective Cruz had difficulty estimating the time line. He estimated that the questioning—both initially and the video statement—took approximately forty-five minutes or possibly an hour. Ms. Joseph, on the other hand, claimed that Defendant Isles was at the station two to three hours before she was allowed to see her daughter.

The Third Circuit has not set forth a bright line rule regarding how long an interrogation must last to constitute a finding that a person is in custody. This factor, as with others, is considered in the context of all of the other factors in assessing the totality of the circumstances. For example, in *King*, an interrogation lasting "several hours" in an FBI office—which was "inherently more intimidating than most locations such as a business office, an automobile, or a

17

public street"—weighed in favor of a finding of custody, although based on the totality of the circumstances—including the fact the door was not locked, the agent did not use coercive tactics, and the defendant voluntarily submitted to questioning—the Court found otherwise. 604 F.3d at 138. In *Morgan*, 562 F. App'x at 130, a two-hour interview in a police station, with the door closed, along with other factors, was deemed not to constitute custody. In *United States v. Griggie*, the Third Circuit noted that an interrogation lasting approximately one hour and fifteen minutes in a police station interview room "was of relatively short duration." 105 F. App'x 431, 436 (3d Cir. 2004). Further, district courts in the Third Circuit have come to differing conclusions in considering this custody factor. *See, e.g.*, *United States v. Gunter*, 2013 WL 1102994, at *3 (E.D. Pa. Mar. 15, 2013) ("The interview took place in the morning and lasted no more than two and a half hours. The length of the interview here does not weigh in favor of finding that Gunter was in custody."); *United States v. Devlin-Bell*, 2013 WL 194200, at *8 (E.D. Pa. Jan. 17, 2013) ("The length of the encounter, about two hours, may weigh slightly in favor of custody; although, this fact alone is certainly not dispositive.").

When assessing this custody factor, the Court finds that the amount of time that Defendant Isles was interviewed is difficult to determine because the testimony on this issue lacked certainty and differed dramatically. Nonetheless, regardless of whose testimony is credited, the Court reaches the same ultimate conclusion—that this factor does not tip the balance in favor of a finding of custody.

Detective Cruz wavered in his estimate of how long the questioning lasted, but testified that it lasted forty-five minutes to an hour at most. He was the only person who had knowledge of this fact because he was in the room questioning Defendant Isles while Detective Fieulleteau and Ms. Joseph were in and out of the room. If the Court were to credit Detective Cruz's

18

testimony, such questioning of relatively short duration would not weigh in favor of a finding that Defendant Isles was in custody. *See Griggie*, 105 F. App'x at 436. But even if the Court were to credit Ms. Joseph's testimony and found that the interview took the greater part of the three-plus hours that Ms. Joseph stated Defendant Isles was at the station[6]—and even assuming that such a fact, by itself, weighed in favor of a finding of custody—that fact alone would not be dispositive. Rather, when considered with the other factors discussed above, in a totality of the circumstances analysis, the length of interrogation factor would not tip the balance in favor of a finding of custody.

Fifth, the custody factors of what the detectives knew concerning Defendant Isles' culpability, and whether they revealed to her their belief that she was guilty, weigh in favor of a finding of custody. The evidence established that as a result of the investigation that had been conducted prior to the interview—including a review of Perfection's surveillance video— Detectives Cruz and Fieulleteau both suspected that Defendant Isles had played a role in the robbery. Further, the Detectives' communications with Isles, including their revelation to her that they had seen the video, could reasonably be interpreted as implying that they believed she was guilty. Accordingly, the Court concludes that these factors weigh in favor of custody.

---

[6] The Third Circuit has opined that, while it does "not ignore the time that a defendant is in custody without being interrogated, *see, e.g., [United States ex rel. Johnson v.] Yeager*, 327 F.2d 311, 315 [3d Cir. 1963] (taking into account both the length of detention and of interrogation), such time should not be conflated with the duration of a continuous interrogation designed to extract a confession." *Halsey v. Pfeiffer*, 750 F.3d 273, 308 n.33 (3d Cir. 2014). Here, there was testimony that, when Detective Fieulleteau entered Detective Cruz's office, no interview was being conducted. Cruz was sitting at his desk, Defendant Isles was sitting on a chair at the side of the desk facing Cruz, and Detective Richardson was at her desk. He heard no questions being asked and no answers being given. This, coupled with the interaction time between Defendant Isles and her parents, indicates that Defendant Isles was not being interviewed during the entire time she was at the police station.

In considering the totality of the circumstances, the Court finds the overview provided in *Mathiason* instructive:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render [her] 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Mathiason*, 429 U.S. at 495. Having considered the seven custody factors set out in *Willaman*, 437 F.3d at 359-60 and *Jacobs*, 431 F.3d at 105, the Court finds that some of those factors weigh in favor of custody. For example, Defendant Isles was at the police station for between one and three hours and was interviewed in a room with the door closed. In addition, Detectives Cruz and Fieulleteau suspected that she was involved in the robbery and, at a minimum, implied in their communications with her that she was guilty.

However, when considering the totality of the circumstances, the foregoing factors do not tip the balance in favor of a finding of custody because the other factors persuasively point in the opposite direction. Defendant Isles came to the police station voluntarily. She was told that she was not under arrest. Although she was questioned in the police station in a room with a closed door, the door was unlocked and unblocked. The officers did not use coercive tactics or loud or hostile voices. They did not "display their weapons, and did not handcuff [defendant] or restrain [her] movement." *Morgan*, 562 F. App'x at 130. In fact, while she was at the police station, Defendant Isles had significant contact with her mother and stepfather. *See King,* 604 F.3d at 138 (finding that while interrogation in FBI office "lasting several hours" favored a finding of custody, the fact that the agent told the defendant he was not under arrest, the office door where

the questioning took place was not locked from the inside, the defendant could have exited at any time, there was no evidence that the agent used coercive tactics, and the defendant voluntarily submitted to questioning, and departed when he chose to do so, led to a finding that defendant was not in custody for purposes of *Miranda*).

Further, even when considering that the Detectives suspected that Defendant Isles had participated in the crime—a factor which, as discussed above, favors custody—the Third Circuit has noted that this factor creates only a "'greater *tendency* to bear down in interrogation and create the kind of atmosphere of significant restraint that triggers *Miranda*[.]'" *Jacobs*, 431 F.3d at 105 (quoting *Steigler*, 496 F.2d at 799) (emphasis added). However, based on the circumstances here, the *tendency* of which the Third Circuit spoke did not ripen into reality. As discussed above, the Court has concluded that the questioning of Defendant Isles by the police did not in fact take place in a coercive "atmosphere of significant restraint" but rather that the atmosphere created by the police was calm and not coercive. *See also Mathiason,* 429 U.S. at 496 (*Miranda* warnings not required simply because police suspect person of a crime).[7]

Accordingly, the Court finds that, under the totality of the circumstances, a reasonable person would perceive that he or she was free to terminate the questioning and leave.[8] As a result, the Court concludes that Defendant Isles was not in custody for *Miranda* purposes when she was questioned by Detective Cruz at the police station. Thus, the Court will not suppress any statements made by Defendant Isles in the police station before she received the *Miranda*

---

[7] Indeed, the testimony reveals that, at most, Detective Fieulleteau did nothing more than what Defendant Isles' own mother did, which was to encourage Isles to tell the truth.

[8] Stated in the Third Circuit's alternately-worded formulation of the test, there was no "restraint on [Defendant Isles'] freedom of movement of the degree associated with a formal arrest." *Jacobs*, 431 F.3d at 105. Thus, the Court rejects Defendant's argument that she was the subject of an illegal arrest.

warnings. *See id.* (finding that defendant "was not in custody and *Miranda* warnings were not required."); *Willaman*, 437 F.3d at 359 ("*Miranda*, of course, requires warnings only when the person the police are questioning is in custody.").

### C.  Deliberate Two-Step Method

Detective Cruz testified that after Ms. Joseph came into the room and told Defendant Isles to tell the truth, and after Ms. Joseph left, he gave Isles the *Miranda* waiver form; read it to her; she signed it; he and Detective Richardson signed it; and Defendant Isles made the video statement. Giving *Miranda* warnings "and getting a waiver has generally produced a virtual ticket of admissibility." *Seibert,* 542 U.S. at 608-09; *see also Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare."). The Government has shown, by a preponderance of the evidence, that Defendant Isles signed the waiver form after being advised of her *Miranda* rights. There is no evidence that "after [she] signed the *Miranda* waiver form, [her] statements to the police. . . were involuntary." *United States v. Whiteford*, 676 F.3d 348, 362 (3d Cir. 2012).[9] The Court finds the waiver valid and the videotaped statement admissible.

Defendant Isles argues, however, that the post-warning videotaped statement should be suppressed because Detective Cruz employed the kind of deliberate two-step interrogation method—interrogating in successive unwarned and warned phases—prohibited under *Missouri v. Seibert*, and curative measures were not taken between her pre-warning and post-warning statements.

---

[9] Defendant Isles did not mount a specific challenge to voluntariness—either to the signing of the waiver form, or to the statements made thereafter.

When a suspect in custody makes incriminating statements without the benefit of *Miranda* warnings, and is then subsequently given *Miranda* warnings and again makes incriminating statements, "it is necessary to determine if the intervening warnings were sufficient to inform the suspect of his/her rights so that the suspect could properly decide whether or not to waive the protections of *Miranda* and make statements to the police." *United States v. Naranjo*, 426 F.3d 221, 227 (3d Cir. 2005) (citing *Oregon v. Elstad*, 470 U.S. 298 (1985)). This type of scenario raises potential concerns that the police have employed a "two-step questioning technique based on a deliberate violation of *Miranda*," in which "[t]he *Miranda* warning [is] withheld to obscure both the practical and legal significance of the admonition when finally given." *Seibert*, 542 U.S. at 620 (Kennedy, J. concurring); *Naranjo*, 426 F.3d at 231–32 (finding that, because *Seibert* was a plurality opinion, Justice Kennedy's concurrence should be viewed as "the holding of the Court" because it provided the "narrowest rationale") (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)).

The two-step questioning approach "permits the accused to conclude that the right not to respond did not exist when the earlier incriminating statements were made." *Id.* The approach is "based on the assumption that *Miranda* warnings will tend to mean less when recited midinterrogation, after inculpatory statements have already been obtained." *Id.* Where the initial failure to warn was part of a "*deliberate* two-step strategy . . . postwarning statements that are related to the substance of the prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.* at 622 (emphasis added).

The Court rejects Defendant Isles' argument that the two-step *Seibert* analysis applies in this case. First, *Seibert* is premised on the making of an inculpatory statement followed by a *Miranda* warning and then a repeat of the inculpatory statement. Here, the undisputed

testimony—which the Court credits—was that no incriminating statements were made when Detective Cruz first spoke to Defendant Isles. On the contrary, she made *exculpatory* statements indicating that she had no role in the robbery. Defendant Isles first made an exculpatory statement; was admonished by her mother to tell the truth; was then given *Miranda* warnings; and only then made an incriminating video recorded statement. As a result, by definition, the two-step approach prohibited in *Siebert* is inapplicable. *See Bobby v. Dixon*, 132 S. Ct. 26, 31 (2011) ("[U]nlike in *Seibert*, there is no concern here that police gave [the defendant] *Miranda* warnings and then led him to repeat an earlier murder confession, because there was no earlier confession to repeat. Indeed, [the defendant] *contradicted* his prior unwarned statements when he confessed to Hammer's murder.").

Further, in order for *Seibert* to apply, the suspect must have been in custody. However, the Court has found that Defendant Isles was not in custody when she was at the police station. As the Ninth Circuit has opined, "[s]ince [defendant] was not in custody during her first interview, the second interview could not have constituted a deliberate two-step interrogation in violation of the governing holding of *Seibert*." *Jones v. Lattimore*, 541 F. App'x 749, 751 (9th Cir. 2013) (citing *United States v. Williams,* 435 F.3d 1148, 1157-58 (9th Cir. 2006)); *see also United States v. Latz,* 162 F. App'x 113, 120 (3d Cir. 2005) ("Thus *Seibert* does not apply because [the police officer] did not deliberately attempt to circumvent *Miranda*."). *Seibert* is therefore inapplicable.

### III.  CONCLUSION

For the reasons stated above, the Court will deny Defendants Isles' Motion to Suppress.

(Dkt. No. 9). An appropriate Order accompanies this Memorandum Opinion.

Date: January 26, 2015                                    _____/s/_____
                                                          WILMA A. LEWIS
                                                          Chief Judge